All right, we'll proceed to hear argument in the last case on calendar for argument And that is 24-762 and 24-801, Rosalie Gonzalez versus United States Human Rights Network. And we will hear first, Mr. Lohman, Lachsman. Okay. All right. Thank you. May it please the court. My name is Timothy Lachsman. Can you move the microphone closer? Miss Timothy Lachsman, I'm here on behalf of appellant Rosalie Gonzalez. I know the court has presented a question in an order before the hearing regarding the cross appeal. I'm going to not address that until I address the. Arguments on rebuttal, so I'm going to reserve about 8 minutes of time for rebuttal. Before I get started with Dr. Gonzalez's arguments, are there any questions from the panel? It's your argument. You may proceed. Thank you, Your Honor. I'm going to begin with Dr. Gonzalez's argument that the district court erred in not granting her motion to leave for leave to amend. The district court's decision was premised on the Ninth Circuit's decision, Johnson v. Mammoth Recreations, which held that after the scheduling order's deadline for amending pleadings has passed, any motion for leave to amend must also comply with Rule 16 standard as well as Rule 15 standard. Now, the Johnson court generally does not explain its reason for that. It sort of presumes that any sort of motion for amend or amendment to the pleading necessarily has to amend the scheduling order, despite the fact that the pleading and the scheduling order are two different documents. So we have to look for a reason for that before we can begin, and I'm going to argue that Rule 15 does not present any reason for Rule 16 standard to apply because Rule 15 presents a comprehensive scheme that addresses when pleading should be amended. Now, Rule 15 has three relevant subsections. It has subsection A, which addresses amendment as a matter of right and when leave is needed before trial. We have subsection B, which amendment at trial or after trial, and we also have supplemental pleading, which is when facts arise outside. Rule 15 doesn't displace Rule 16's authority to set schedules and deadlines. And if those deadlines are passed as it was here, then Rule 16 says good cause has to be shown. That presumes that you need to amend the scheduling order to amend the pleading. And I don't believe... What's our standard of review for this issue? So this is a abuse of discretion review, I believe, but because Dr. Gonzalez is raising a legal issue, you essentially review that de novo. What is your best authority for the fact that we would review this in any way de novo? Sorry? What is your best authority for arguing that we would review any portion of this particular claim of yours de novo? Oh, that this is an error of law and therefore is a question of law that the court reviews de novo. But the compliance with the scheduling order is a discretionary decision that we give district court judges, isn't it? I believe that is correct, Your Honor. The district court has discretion in setting the scheduling order and whether to amend it. However, the presumption that you necessarily have to alter the scheduling order before you can amend a pleading just because the scheduling order deadline has passed, I don't see any basis for that in Rule 15 or Rule 16. Right. So my point in asking you about the standard of review is here the district court determined that there was a failure to show diligence. That determination, it must be reviewed on an abuse of discretion standard. Correct. But the court made that determination under Rule 16 rather than Rule 15. And those are very different standards. So Rule 16... I still, I'm not sure I understand why you think Rule 16 doesn't apply when Rule 16 authorizes a scheduling order. A scheduling order was issued here and it set a deadline of August 2020 to amend the pleadings. And then she seeks to file the amended complaint in May of 21, which is after the deadline set. And so therefore, it requires an amendment of the schedule, which Rule 16 says requires a showing of good cause. Where am I making a mistake? The gap is that amendment of a scheduling order is separate from amendment of a pleading. While the court has issued... Not that the scheduling order has a deadline for amending pleadings. Correct. Then you have, you know, you can have two rules that are implicated in the same, you know, we have rules about discovery and those are governed by other rules as well, but it doesn't take them out of Rule 16 to have deadlines. I don't disagree with you, Your Honor. I think it's a factual question that Dr. Gonzalez is only seeking amendment of her pleading rather than a scheduling order. So you have to graft Rule 16 onto Rule 15 standard in that instance. I just can't imagine a world where, as an appellate court, we would have to be reviewing all of the decisions de novo on amendments of the scheduling order. I mean, that would be a nightmare. Perhaps I misspoke when I stated de novo review. What I meant is that this is a question, Dr. Gonzalez is appealing the court's application of this rule that Rule 16 even has to apply. That's a question of law whether Rule 16 applies when you move to amend. So I acknowledge that Rule 15 is generally an abuse of discretion standard. I'm saying that because the question specifically presented on appeal is a legal question and a pure legal question, that you would review that legal question de novo. And I apologize for any misunderstanding. So the reason why you have those separate documents, the scheduling order and the amended pleading, and why there's no reason that you necessarily need to amend the scheduling order to amend a pleading is because Rule 15 has this very comprehensive scheme that addresses amendment of pleading before trial and after trial. Now, as a logical basis, you realize that the scheduling order's deadline for amending pleadings is going to pass at some point. It's a mandatory requirement entered in every case pursuant to Rule 16. That said, we have a separate standard under Rule 15 that you can amend after trial. And importantly, Rule 15b2 states, in part, when an issue not raised by the pleadings is tried by the party's express or implied consent, it must be treated in all respects as if raised by the pleadings. But failure to amend does not affect the result of the trial of that issue. Counsel, I'm going to ask you to switch gears here for a moment and on the issue of the acknowledgment of the indebtedness. I'm curious to know why the May 2019 email exchange wasn't admitted as an exhibited file. It was a tactical decision, Your Honor. We were evaluating the evidence. We decided that the cleaner and simpler document to use was simply the June 2019 offer letter. Returning to Dr. Gonzales' discussion of the motion for leave to amend, aside from Rule 16 providing this comprehensive standard that doesn't address scheduling orders, you also have the issue that there's going to be an inevitable conflict between Rule 16's scheduling order and the good cause requirement and amendment of pleadings after trial, right, that there's always going to be some issue there. So you're going to have to reconcile these two standards. You don't even need to reach that far because of Dr. Gonzales' appeal, which was not, sorry, her motion to amend, which was after the scheduling order's deadline, but not before the trial. Had that because justice so requires standard. And under that standard, the party opposing amendment bears the burden. And importantly, that amendment cannot be denied solely because of delay. This is the DCD program's case, 833 F2D. I don't have the exact site. On the contrast, Rule 16 places the burden on the party seeking amendment, and it can be denied solely because of delay. So those are just mutually inconsistent standards. So if Dr. Gonzales was going to succeed on her motion, she would have had to satisfy Rule 16, the burden placed on her. Meanwhile, the network would have never been able to satisfy its burden under Rule 15. So I just don't see why you would impose those two standards when they're going to conflict with one another. Because essentially, by saying the scheduling order and Rule 16 are always going to apply, you're going to invalidate Rule 15, which doesn't make sense because the scheduling order is going to be in every case. Turning to Dr. Gonzales' other arguments on appeal, her retaliatory termination claim, there are three kind of key thoughts to keep in mind. First is that the network had this future funding rationale, which it's provided absolutely no evidence of. The district court noted that it was distinct, that the basis for that rationale were fundamentally distinct from the rationales that the network tried to paint as the same rationale. And that raises the question under the Villaremo case, whether the network retracted it. Now, there's a jury question on that simply because the network provided absolutely no evidence in support of it and said pivoted to different reasons. So having established that, we look at that when the network asserted that rationale. That was the September 2019 phone call. The very first time that the network informed Dr. Gonzales of its termination decision. And at that time, the termination decision was final. So we have to ask ourselves, why did the network come up with a faulty reason when it purportedly had all these others? And that creates the causation question that gets to why the Sarney case really matters here. Because in Sarney, the employer had knowledge of existing prior issues. The employee made a those were fireable offenses. And that's the real question here, is that Dr. Gonzales made her arguments that, or sorry, she complained. And then all of a sudden, the network changed its position on all these other circumstances and found a reason to terminate her. And the reason why a question of fact exists on all that is because the pretext inquiry is focused on the reason for the network's decision. So it may have found that there were... Didn't you waive your argument about the motivating factor standard? No, Your Honor. The motivating factor standard was affirmatively argued by Dr. Gonzales to apply during the summary judgment briefing. The district court misapplied that standard. Can you just point us to that? I don't know if I found that. At some point, maybe in rebuttal, you can... You want to where Dr. Gonzales raised the motivating factor standard at summary judgment? No, in front of the district court. Oh, in front of the district court. Sure. So that motivating factor standard, as stated in Czarny, is that you can have a substantial motivating factor, but not the sole reason for the termination. So that also gets to the point that even if the network found these reasons to be valid reasons, you still have to look at why they asserted them in the first place. And the record is replete with numerous instances of the having bases, but then proceeding to not take any action. And in fact, taking action contrary to their belief that they thought those were terminable bases. Most notably, the June 2019 offer letter itself. So considering the fact that this financial stewardship, these past funding rationales already existed at that time, the fact that the network is now asserting them having presented an offer letter after knowing they existed just fundamentally begs the question of why was it a fireable offense then? And in fact, we were willing to contract with Dr. Gonzales, but after she complained, suddenly it's a fireable offense. So Dr. Gonzales also raises the issue that if she presents pretext as to some of the network's rationales, then there is a general question of credibility. I think that issue is heightened by the fact that the network is relying on generally past events that had occurred prior to the termination decision, as you would expect. However, they didn't raise those as fireable offenses until after Dr. Gonzales terminated her. And then you have to look at the question that when they had the opportunity to assert those reasons, they instead made up the future funding rationale for which they had no bases, which cast doubt on their assertion of all those other after-the-fact offenses. And this is kind of gets the real key faulty issue in the district court's logic. Now, I thought I'd heard you said you wanted to save eight minutes for a bottle because it looks like you're within that time. You can keep going. It's your time. No, thank you, Your Honor. I, for one, would like you to address the focus order that was provided by the court. Certainly, Your Honor. So, Dr. Gonzales' position is that the network's appeal of summary judgment presents a sufficiency of the evidence question. In fact, the headlines or the headings for their arguments, in fact, say this is Dr. Gonzales, the May 2019. Do you agree it's barred by Ortiz? Yes, that would be my position. I would also add that Ortiz has mentioned that, well, sorry, the issue of acknowledgment of their just debt went to trial regardless. So, that factual record has been developed. There's no reason why changing, reversing the decision at summary judgment would have any impact on that. There's just, it wouldn't even be issue preclusion. So, I'll reserve the rest of my time. All right. Thank you, counsel. So, we'll hear next from Mr. Leonhardt. Good morning, Your Honor. May it please the court, my name is Shanks Leonhardt. I'm from the law firm of Sanders and Parks. With me is my colleague, Vincent Miner. We're counsel for the Abilene and the Cross Appellant in this matter, the U.S. Human Rights Network. Let me start by addressing the issue with a focus order. This court can and should review the denial of summary judgment. I note that as an unusual. How can that possibly be true under Dupree and Ortiz? There is a different factual record in the, at summary judgment, and that's denied. And then it goes to trial, and there's a different trial record on the issue. And then there's a JMO motion with respect to that. Exactly what Ortiz and Dupree say is that we don't care about the summary judgment record, which may have been different. It's superseded by the trial record. It's not appealable, not reviewable. How do you get around that? So I agree with Your Honor that that is the general rule. And you seem to be within the general rule. Well, we probably disagree with Your Honor on respectfully. Our position, Your Honor, is that the denial of the motion for summary judgment on the application of a savings statute, statute of limitations defense, was a pure legal decision. We've argued that throughout the case that the judge needs to make that decision as a matter of law. And so if you look at the Dupree case, which is... I'm not sure why you need to hang your hat on this particular argument that I think you're making with respect to the statute of limitations. If at the JMO stage, you have insufficiency of the evidence based on the failure to have admitted the, what appears to me to be a pretty important email, the 2019 email into evidence. And so relying entirely on the JMO record, I think you get to the same place. I don't disagree, Your Honor. And I don't want to give this court the indication that it's a binary position, that it's one or the other. We argued obviously both. We did file a Rule 50b motion. Our position is, as Your Honor noted, that the evidence presented at trial was insufficient because the appellant failed to introduce the May 19 email, which contained the, I'm sorry, getting you up to speed language, which Judge Lanza had identified as reflecting the justness component or the moral obligation. So absolutely, Your Honor. I think as an academic exercise, I believe that you can decide this at the summary judgment level under the Dupree case, but I agree that you can also decide at the JMO. You characterize it as a legal question, but it's a legal question where the facts matter and the facts that are in the record matter to the determination of that legal question, correct? Yes, Your Honor. Ultimately, it's summary judgment where the district court can't make factual determinations. It's just an assessment of whether or not there is sufficient evidence under the legal standard to meet the standard. And so even though it's a question of law, ultimately, it's still governed by Ortiz. Sure, Your Honor. And maybe you tell us about why you think the JMO. Sure, sure. I think the JMO issue, as Judge Desai has pointed out, the evidentiary defect at trial was the failure to include the critical email that the trial court had relied upon in denying the summary judgment motion, and that was the May 2019 email. That's Volume 3, Excerpt of Record 476. That's the email that had the apology language in it. Again, our position is that even that email was not enough, but certainly when you strip the other writing that is cited, which is the conditional job offer, away from the May 19 email, you lose the justice or the execution piece of it. And what you're left with is simply a letter stating, we'd like to offer you a job. If you'd like to take that job, please sign below and accept that offer. And the evidence in the trial record was undisputed that the plaintiff never accepted it, not by signature, not by phone call, not by anything. So our position is that the evidence on trial was deficient because it didn't satisfy those elements you need to establish that savings statute under 12-508, which is that there is a sufficient identified obligation, that it contains a promise, and that it contains an expression of the justice of the debt. And the job offer letter does not contain those particular elements. And so that was the basis for our Rule 50B motion, and the basis for our appeal on that is that the evidence should have warranted a judgment as a matter of law on that issue, Your Honor. Let me address just briefly the issue of the motivating factor. I agree with this court that that was not raised to the trial court. It was not raised in a motion for reconsideration. It was not raised in the Rule 59 motion for new trial. The issues that were raised at the Rule 59 stage in the motion for new trial had to do with whether certain evidence at trial demonstrated evidence of pretext, so that the causation standard was never applied. Secondarily, this trial court didn't grant summary judgment on causation. It's not a causation case. It's a pretext case. And the pretext analysis, which both sides agree here, is governed by McDonnell Douglas. And, you know, Arizona has applied McDonnell Douglas to AEPA claims, which is what this claim was. And, you know, if you look to the Burdine case, the U.S. Supreme Court, you know, that gives us the roadmap for how to look at an appellant like this that's going to try to prove pretext in the face of legitimate nondiscriminatory reasons based on circumstantial evidence. And it's got to be specific and it's got to be substantial. And so the court went through and analyzed each of the legitimate reasons that the network provided and demonstrated that plaintiff did not rebut those with specific and substantial evidence. The Czarny case that's referenced strongly by the appellant is not instructive. It's a, for one, it's an intermediate unpublished appellate decision in the state courts here. And number two, it cites and relies specifically on the United States Supreme Court precedent and this court's precedent. So I would, you know, encourage this court to look for the answers to the questions on whether pretext has been demonstrated by looking to this court's decisions that flow from Burdine. The Villarrealmo case is one. The Colgan case is another. And we cite those in the trial court, address those in the decision. The issues pertaining to the allegations of shifting reasons, to be honest, Your Honor, and we argued this at the trial court, they're largely semantical. They're a difference in authorship. So you have an executive or a board member that writes an email that says one of the reasons that we're moving on from this executive director is due to a spate of claims by former employees. There had been three grievances filed for the appellant, one of which is she terminated a subordinate who was on maternity leave generating an EEOC complaint. So that was referred to as a spate of claims. And then what's being argued here is that when my law firm filed a motion for summary judgment and we put a heading in there and we said one of the legitimate reasons for the grievance, this was for the grievances, that that wasn't the exact same language used in the spate of claims. And the trial court properly found that not to be a meritorious argument. The shifting rationale or the shifting reasons would be fundamentally different reasons than were presented, not just because one author describes this this way and one author describes it that way. So again, our position is that the trial court did properly evaluate all the issues related to pretext and determine that those did not reflect that specific and substantial evidence that Burdine requires and this court requires. You know, as it pertains to the motion to amend issue, you know, what's being argued here is a very novel argument that sounds like is asking this court to reshape the rules of civil procedure and decades of precedent in the Ninth Circuit. I don't think the court needs to even entertain that analysis to make a decision here. If you read the judge's order denying the motion to amend, I would submit to you that it absolutely complies with Rule 15 as well. It cites the undue delay. It cites, which is a ground under Rule 15, of course, to deny. And again, as this court has it is an abuse of discretion standard. And really, the issue of prejudice is a little bit of a misnomer here in some of the arguments that the appellant is making, because if you look at Rule 15, it talks about prejudice, but it also talks about bad faith, and it also says or undue delay. So it's kind of an or situation. The Lockheed Martin case, which we've cited, is very instructive. It's very similar facts. That's 194 Fed Third at 986. And again, we would submit to your honors that as it pertains to that issue, that the court absolutely complied with the rules, whether it's under Rule 16 or Rule 15 under abuse of discretion. But your response to his point that, you know, if Rule 16 can be invoked to set hard pre-trial deadlines for amendment of the pleadings, that that renders nugatory the whole provision of Rule 15 about amendment during trial. Yeah, I understand that the framing of that argument, I guess my objection to it being number one, it's not been recognized by any court in the United States that I'm aware of, nor the United States Supreme Court or any sister circuit or this court. This court has continually applied the Johnson rule from 1992 for decades. And I think that if you go back and read Johnson and you understand the basis for it, it's absolutely logical. If you're going to amend the scheduling order, you have to demonstrate the good cause to do that. You know, the other reason that I don't think the court needs to really entertain any of these issues about the interplay of Rule 15 and 16 is that, you know, this appellant chose upon the denial of the motion to amend to refile that action. So she could have waited, her trial, come before this court and said, my motion to amend was denied. It was abuse of discretion. That's not what she did. She went and filed a new lawsuit. That lawsuit was then dismissed with prejudice on Rule 12b-6 and for failure to state a claim. And then that was appealed to this court and that appeal was abandoned. And so for that other reason, there's no way to revive that claim that's been dismissed with prejudice. That judgment is final. You can't revive that claim through a motion to amend in this case. So that's another separate reason why we don't need to entertain the Rule 15 or Rule 16 type analysis. The final thing I want to touch on and I'll reserve the five minutes of my time is, you know, when it comes to the issue of the acknowledgment of the debt. We don't go back and forth on cross appeals. You have one block of time now. Oh, I'm not going to reserve? No. Okay. It's not like the briefing. Thank you for the clarification, Your Honor. I'll keep trucking. Tell us everything you want us to hear now. I'll keep trucking. Thank you. So, yeah, on the issue of the cross appeal, we talked a little bit about already the acknowledgment of the debt, but there's another element to the cross appeal and that has to do with the continuous violation doctrine. So at trial and at summary judgment, the court, although it was really more at trial that this came up in the post-trial or, I guess, a final trial briefing, this issue of, okay, if the court were to find that the acknowledgment of the debt was insufficient, would there be an accrual continuing for every pay period such that the statute of limitations would only bar the first three months or whatever it was before the one-year mark where she's filed her lawsuit? And I wanted to touch on that briefly because that is our briefings. The continuous violation doctrine is a doctrine that has been applied to easily divisible-type contracts. The seminal case is a case called builder supply. It had to do with trucking different loads to different zones in the city, and depending on what zone you went into, the truck got paid a certain load calculation. And the facts of that case were that there was a number of years where the one delivering the loads or the one paying, I can't remember which, it's not material, was paying the wrong rate. And that went on for many years, and the court looked at that and said, well, we're not going to bar the whole thing, even though you knew or should have known, you know, years ago that you were getting charged the wrong rate or paying the wrong rate. This is an easily divisible thing, and each time the load goes into here, it's a new breach. That's the primary basis by which the court found here that there was a continuous violation. Our position is that that has never been applied in employment context. The issue that was at issue with the breach of contract related to an oral contract that the jury found was made in December or January of 1819, and the idea was that starting January 1, the appellant would become a full-time employee with all the benefits. And the evidence was undisputed at summary judgment at trial that the plaintiff was well aware, starting January 1, 2, 3, 4, all the way, that she was not a full employee and was not receiving all of her benefits. So our position is that that is a breach at that point in time. And the fact that she continued to work there for 11 months, which she did, continuing to be paid as an independent contractor, does not create a separate breach every pay period. The breach was in the failure to honor the oral agreement. The case that we found or we think is the most applicable here, because again, there really isn't a lot of direction on this, is a case from the district court here in Arizona that had to do with an oral promise to make somebody a vice president. And so there was an oral promise that, you know, these certain conditions were met, we'll make you vice president. Ultimately, that never happened. That person was never made a vice president. And then it went beyond the one-year statute of limitations. They filed in the court in that case. That's called the day case. They determined that that was time barred. So that is the continuous violation doctrine. Unless the court has any other questions for me. I have just a quick question on your argument with respect to builder supply. I know you're arguing that it did not, that case did not arise in the context of an employment issue, but didn't builder supply cite several cases from other jurisdictions that applied the continuous violation doctrine to wage payment claims? Yeah, I think that, Your Honor, that's a good question. And I do recall that there may be decisions that would apply. And there's been, I think, one of the ones the trial court relied on was the Damacy case. But in this context, we've argued those are distinct. So those are hourly cases. So, you know, there's this principle in employment that days wage for days work, right? That's, those cases talk about that in the context of an hourly employee, meaning, you know, the idea is that, you know, you're an at-will employee, you work here today, you get paid for today. There's no guarantee you're working here tomorrow. That's the basis for that type of analysis. We think this case is distinct. This is not an hourly employee. This was the highest-ranking executive of the network. Why isn't the logic of it applicable here? Sorry, I didn't hear you. Why isn't the logic of it applicable here? Well, because in this situation, the decision to, or the failure to make the appellant the full-time employee was a singular event. It occurred in January when the appellant was not made a full-time employee. So that's the breach. There's not a subsequent breach each pay period. Again, we analogized it to the Ancala case, which is an unpublished case, but it's related to the management of a golf course. You know, you weren't managing the golf course properly. You're not managing it properly on day one, day two, day three, day four. It doesn't create a separate individual breach. The breach is when you learn that's not being properly managed, and that's the basis for our position that here it's more akin to the vice president or the golf course management. It's a singular event where the plaintiff knew as of January that they were not being put in this full-time position as a permanent executive director, and it was incumbent upon her at that point in time to bring that action within one year. So any other questions? Thank you for your time. All right. Thank you, counsel. We'll hear from Roboto. I'd like to return to Judge Desai's question about where Dr. Gonzales raised at some rate judgment the applicable standard causation. That was 2ER244. It's actually raised in dispute, or sorry, to dispute the numbers position that he bought for causation standard applied. So this was squarely before the court. Wait, I thought you argued, you argued it in the motion for reconsideration. We argued it in the summary judgment motion. I thought that in your brief, your yellow brief at page 3, you said Dr. Gonzales did not waive her argument by not raising it at summary judgment. Oh, sorry. That, sorry, Your Honor. That is specific to the court's misapplication of the motivating factor standard, which only happened because the court misapplied it. That's what you intended to say there? Yes. Yeah. The court misapplied it, so Dr. Gonzales could not have raised it at summary judgment. She did not waive it by not raising it at summary judgment because she could not have. I see your argument. Thank you. Returning to opposing counsel's continuous violation argument, I agree with Judge Desai that the Builder Supply Court cites employment cases from out of state. There's also... But what do you say to the argument that your friend on the other side made that it's still distinguishable and it shouldn't apply in this context to the highest executive of the organization? I would say that there's no foundation for the network's argument because this was an at-will employment relationship that a day's work created the new contract. So every day there was a new contract. I know that's very much a kind of legal fiction, but it is the way that the law works. And that's what matters because accrual of a breach of contract cause requires both the contract, the breach, and damages. And Dr. Gonzales certainly didn't have any damages until the day that she actually performed the work and would have been entitled to those benefits. Now, regarding the Day v. LSI case, that case just doesn't even apply. It doesn't address the continuing violation whatsoever. In fact, the employee in that case didn't even oppose the statute of limitations. So the decision just has very little relevance. Regarding the Ancala case, that case, one, was golf course management. But separately, it's also a Ninth Circuit unpublished decision, so it's not binding. And it's definitely not indicative of where Arizona law would be, particularly on the issue of at-will employment. The Damascus case really sets that up very clearly, that at-will employment relationship, which this was, they don't contest that, is formed every day. And because of that, you have a new contract every day. Now, regarding the acknowledgment of the just debt, I don't, I'm going to focus on the June 2019 offer letter. And I'm going to be very clear that the network has, we have two diametrically opposed factual situations here. The network believes that there was no oral agreement, and therefore this June offer letter was just whole cloth, a new offer letter. If that was true, why is it dated January 2019? There is absolutely no explanation for that. The only reasonable explanation for that is that the network realized that they had an obligation to employ Dr. Gonzalez as of January 2019. Now, there's a factual dispute about whether or not there was an oral agreement that the jury found in Dr. Gonzalez's favor on that issue, but the network still contested. But regardless, if Dr. Gonzalez's view that there was an oral agreement and there's no other explanation for the January 2019 language, then that's a reference back to her oral agreement. Secondarily, I'm going to direct the Court to the In re Weaver case, which is a decision by this Court that addressed the justness element of the 12-508 requirements. And it says that it's really a know it when you see it sort of situation. There doesn't have to be anything there. And in particular, Weaver, as well as Sladke, more or less decide that the justness element exists because the opposing side does not push back. So the fact that the network has put forth this document stating, yeah, this is like the terms of your employment, all the benefits you are going to have, it's backdated to January 19. And there's really no reasonable juror reads so much meaning into the date of the letter. Well, what other explanation could there be, Your Honor? I don't believe I'm overreading it because I can't think of another logical explanation for it. Well, I mean, I guess part of my difficulty here is that you wouldn't have had to rely on that had you had the May 2019 email in evidence. I mean, according to opposing counsel's position, I would have. But regardless, I don't see how the absence of the May 2019 letter does anything because the June 2019 letter contains the required elements. It's in writing. It's signed based on the signature or the email. At least that's not contested on appeal. It references the January. You're talking about the June 2019 email now? Sorry, the June. Well, that's that's I referenced that for the signature requirement under 12508, which is not an issue in the cross appeal. But that's what was argued at the trial or at the trial. So regarding the reference to the prior agreement, again, there's no other explanation for the January 2019 language. According to the network's own viewpoint, there had to be a signed written offer letter before any agreement could be formed, which means why is this document backdated to January 19? Under their own theories of the case, there is no explanation for why it's backdated. Dr. Gonzalez offers that the only plausible explanation is because of the oral agreement. I see that my time is up. There are no further questions. All right. Thank you, counsel. Thank you, counsel. Both sides for their arguments in this case and the case just argued will be submitted. And this court for this session stands adjourned. Well, now the court for this session now stands adjourned.
judges: COLLINS, MENDOZA, DESAI